## No. 31,597

LINA DENT GIBBS and JAMES J. VENABLE, *Appellants,* v. MARY AGNES TURNER et al., *Appellees* and *Cross Appellants.*

(34 P. 2d 564.)

Opinion filed July 7, 1934.

*Arthur Cranston, Mark Gillin, Earl Bohannon, W. W. Brown,* all of Parsons, and *L. E. Goodrich,* of Oswego, for the appellants.

*T. R. Evans,* of Chanute, for the appellees and cross appellants.

The opinion of the court was delivered by

JOHNSTON, C. J.: Anderson M. Morton, a resident of Kentucky, died testate owning a considerable estate of personal and real property, one piece of which was a lot with a business house thereon in Parsons, which was valued for taxation purposes at about $11,000. The testator had seven brothers and two sisters residing in various states, and all living except one sister, who left descendants, two of whom, a grand-niece and a grand-nephew, brought this action and asked to have the others, about sixty defendants, excluded from the premises and to have the property in Parsons declared to be the plaintiffs'.

In the will there was a provision giving an interest in lot twenty-one (21), block twenty-six (26), Parsons property, to the three unmarried daughters of Selina Morton Canfield, by virtue of the following clause. It recites:

(3) "To F. R. Morton in trust for the benefit of my nieces Helen W. Canfield, Elizabeth M. Canfield and Mary A. Canfield, daughters of my sister Selina, lot (21), block (26), in the city of Parsons, Kansas, and direct that the trustees shall pay annually in equal shares the net income thereof to said legatees during their natural lives. The trustee is empowered to direct and control the disbursement of the income of said property for the sole use and benefit of said legatees, as though he was their guardian. In case any of them die without issue her portion shall vest in her sisters or their issue. The trustee is empowered to appoint his successor in this trust, but said successor shall not have the power to control the income of said property conferred upon F. R. Morton as trustee."

This provision and the property devised is the subject of controversy in the case.

The will disposed of various sums of money in trust to relatives of the testator and amounts were given to each, such as $300, $400, $600, $700, $900, $1,000, $1,400, $3,000 and $6,000. Then he gave specific pieces of property to relatives that were definitely described. He appointed F. R. Morton as his sole executor for the property in Kansas, and John S. Hanna as his sole executor of property in Kentucky, and fixed the full compensation each of the executors should receive for his services, and he empowered Hanna as executor to pay all expenses in the purchase of a lot in the cemetery and the erection of a monument thereon at his grave, not to exceed the amount of $900. He also provided that Hanna should provide for any deficiency F. R. Morton might have to meet in any legacies

and trusts devised by him in Kansas, and to pay any debts against his estate in Kansas. The testator took the precaution to provide a residuary clause disposing of any property not disposed of in the will by the following clause:

(17) "I will and direct that the residue of my estate not disposed of by this instrument or any codicil that may hereafter be added thereto, shall be divided among the legatees hereinbefore mentioned. Giving to each a portion thereof in proportion to the amount devised to each of them hereinbefore. And when trusts have been created herein as to the portions of any of the said legatees, their respective portions of said residuary are to be taken and held by the trustee aforesaid in said proportion on the respective trusts and provisions of each case."

There were no changes in the will nor was any codicil executed. Then he added section 18 of the will:

(18) "In all of the above provisions where I have devised or bequeathed anything to F. R. Morton in trust for any other beneficiary under this will I authorize and empower him, in case of his death, to appoint his successor or successors as trustee or trustees by last will and testament, to carry out each and any of said trusts with the like power and discretion that I have given to him, except where I have heretofore expressly limited the power of said successor. And where I have directed the trustee in any case to pay over the income or rent, I mean the net income or rents after the payment of taxes, repairs and insurance and all expenses that may be necessary. The two interlineations in 1st clause, and one in 3d clause were made before signing.

"Witness my hand this 26th September, 1883."

Many of the facts involved in the controversy were agreed to by the parties, such as the fact that the testator had died unmarried and without issue; that his parents were dead; that F. R. Morton, the trustee in the property involved, never made any report to or filed any annual account of his trusteeship for the three nieces of the testator; that the only appearance of him as trustee for those three girls in the probate court of Labette county, was when he filed his resignation on September 15, 1892, when he made the following resignation:

"I hereby offer my resignation as trustee under the will of A. M. Morton, for the following persons: H. T. Morton, Selina J. Venable, Helen W. Canfield, Elizabeth M. Canfield and Mary A. Canfield.

"I hereby nominate and appoint as my successors Mary A. Morton, as trustee for H. T. Morton, and Selina J. Venable, as trustee for Helen M. Canfield, Elizabeth M. Canfield and Mary A. Canfield. And Mary A. Canfield to act as trustee for Selina J. Venable. I hereby petition the honorable probate court to approve and confirm the aforesaid persons as my successors in said trusts."

This resignation was approved by the probate court of Labette county, as was also the appointment of his successor on September 15, 1892. But Selina J. Venable never qualified as trustee for the three Canfield sisters, and never at any time made any report or rendered any account of any kind as trustee to the probate court of Labette county.

It was further agreed that F. R. Morton did not appoint his successor or successors as trustee for Helen W. Canfield, Elizabeth M. Canfield and Mary A. Canfield, by last will and testament to carry out said trust, as provided by paragraph 18 of said last will of Anderson M. Morton, deceased; and that after the resignation on September 15, 1892, Selina J. Venable never at any time formally accepted or qualified as trustee, by giving bond or otherwise, for the three Canfield sisters.

It appears that Selina J. Morton, a predeceased sister of the full blood of Anderson M. Morton, intermarried with Isaac Washington Canfield, and as the fruit of said marriage there were born to them the following-named children, to wit:

"Helen Walton Canfield, born September 5, 1851, died on the 2d day of August, 1899, unmarried and without issue; William Quin Canfield, born February 2, 1854, died on the 15th day of July, 1888; Elizabeth Morton Canfield, born the 29th day of May, 1856, died on the 22d day of June, 1927; Selina Jane Canfield, born on the 14th day of February, 1858, died February 26, 1932; Mary Agnes Canfield, born on the 14th day of September, 1860, died on the 13th day of November, 1931; Benjamin Rivers Canfield, born on the 27th day of April, 1862, died on the 6th day of October, 1864; James Caldwell Canfield, born on the first day of January, 1866, died on the 4th day of July, 1866; and Joseph Anderson Canfield, born January 9, 1871, died in the month of June, 1871."

It appears that Elizabeth Morton Canfield regularly and legally adopted the defendant, Helen Gladys Canfield Smith, and legally executed and published her last will and testament, which was duly admitted to probate court in Labette county, and that Elizabeth died, unmarried and without issue of her body. Selina J. Canfield intermarried with James Venable, and to that union were born two children, Selina Dent Gibbs and James Venable, the other plaintiff herein. It was further agreed that Helen Gladys Canfield is in nowise related by blood to Helen W. Canfield, Elizabeth M. Canfield or Mary A. Canfield, or Selina J. Venable.

In the evidence it was shown that at the time the will was written the three sisters mentioned in paragraph three of the will had no

business training, were not married, not educated in any business career, and had no business to look after. Helen became a school teacher after the will was made. Their father was then living, and did not have any property to look after. The appraisement of the property of the estate of the testator was given, including the property specifically bequeathed and the value of the same.

The court made findings of fact based on the provisions of the will, recited the facts agreed upon and some oral testimony which in nowise influenced or affected the consideration of the case. In addition to the facts as stated in paragraph number two of the agreed statement of facts, the court found that the will involved was not properly authenticated, but that all the parties interested acted on the assumption that the will was properly proved, and in addition had been acquiesced in and conformed to the provisions of the will so far as to recognize its binding force and the disposition of the property made therein, and there was an additional finding that all parties to the action who are making claims to the property are doing it through and under the will.

The trial court then takes up paragraph three of the will as recited herein and finds that after the death of Helen W. Canfield, the two remaining sisters, Elizabeth M. and Mary A. Canfield, did pay to Selina J. Venable, the mother of the plaintiffs, one-third of Helen W. Canfield's interest, or one-ninth of the whole, and that after the death of Elizabeth M. Canfield, Mary A. Canfield paid to Mrs. Venable one-half of Elizabeth M. Canfield's one-third interest, or one-sixth, which, added to the one-ninth she was already receiving from Helen W. Canfield's interest, made three-ninths interest, but also found that these payments were not paid in recognition of any interest inuring to Selina J. Venable under the provisions of said paragraph three, nor were such payments made as a result of any construction or interpretation placed upon the provisions of said paragraph by any of the three sisters mentioned therein.

The conclusion of law was that, "Anderson M. Morton intended to and did devise to the three nieces (naming them) the entire beneficial interest in and to the real property described, and that it was his intention and purpose that the survivor of the three sisters should have and take the entire fee interest." Paragraph three contains this provision:

"In case any of them (any of the three mentioned) die without issue, her portion shall vest in her sisters or their issue.

"This, I think, becomes apparent from the will when we consider that out of the eight trusts created by the will, the testator directed the disposition of the remainder in all such trusts with the exception of the one created by paragraph three. I do not think it was the intention of the testator as to the remainder of this trust that it be cast into the residuary clause of the will—the residuary clause being paragraph seventeen."

As already stated, the meaning and effect of paragraph three of the will is the principal controversy in the case. It is argued that an estate tail was given to the three legatees and that as they had no issue the estate had reverted to the original donor. The property was not given to the three nieces mentioned in the paragraph. It was given to F. R. Morton, as trustee for them, and he was directed to pay to them annually in equal installments the net income of the property. The trustee was empowered to direct and control the disbursement of the income of the property for the sole use and benefit of the three legatees as though he were their guardian. It was not an estate tail, as no estate was granted to the three named nieces. To make such an estate it has been decided that the will should devise directly, and without restricting qualifications, a life estate to the first taker with remainder over to the heirs of their body in alodial fee. (*Grossenbacher v. Spring*, 108 Kan. 397, 195 Pac. 884.) The trial court found it unnecessary to determine this question as the conclusions it had reached rendered a decision of the question unnecessary.

The question arises, what was given to the three sisters, nieces of the testator, by section three of the will? A reading of that section leads the court to hold and adjudge that the only income given to them was the net income from the property, the legal title of which was given to F. R. Morton, the trustee. He was directed to pay to them annually the income of the property during their natural lives. Nothing more than income was given to the nieces. There was the further provision that the trustee should control the disbursement of the income of the property so given to the three nieces and legatees as though he were their guardian. The provision was made that in case any of the three legatees died without issue, the portion given to her should vest in the remaining sisters or their issue. It is evident that the testator had in mind that these legatees were unskilled in business and, therefore, the supervision and control of the gift was with the direction to the trustee to pay the net income of the property to the three legatees. The trustee was given the

further power to direct and control the disbursement of the income so given for their use and benefit as though he were their guardian. Looking to the future he wrote, if any of them die, her portion shall vest in her sisters or their issue. The three legatees remained unmarried and had no issue. It is agreed that Helen was born February 2, 1851, and died on August 2, 1899; Elizabeth was born on May 29, 1856, and died on June 22, 1927; and Mary, the survivor of the three, was born on September 14, 1860, and died on November 13, 1931. The net income was paid to the three sisters until after F. R. Morton resigned as trustee, and while he named a successor, it appears that she never qualified as trustee of the three legatees mentioned.

The words in the will that, "In case any of them die without issue, her portion shall vest in her sisters or their issue," refers, we think, to the three nieces of the testator for whose benefit the gift was made. The three legatees had one other sister, Mrs. Venable, but the language employed makes it evident that the sisters spoken of in this clause were confined to the three beneficiaries and legatees and did not include the other sister. Provision is made for her in another part of the will. The will recites that at the death of one without issue "her portion"—that is, the amount given to her, which, as we have seen, was intended as income—shall vest in the surviving sisters for whose benefit the gift was made or to their issue.

What do the words "their issue" imply? It is evident, we think, that the testator had in mind children of their bodies and not children by adoption. He evidently had a desire to pass the property along to persons in the line of ancestral blood and, therefore, that the three nieces or their issue meant that at their ages he thought they possibly or probably might marry and have issue, and that such issue would be children of the Morton blood and not children by adoption. That was the view expressed in *Gardner v. Anderson*, 116 Kan. 431, 227 Pac. 743. In the syllabus of the case the word "issue" was defined, where it was said:

"In a devise to a person for life and at her death to her issue, the word 'issue' means 'offspring,' 'progeny,' 'lineal descendants,' but not mere statutory heirs or heirs at law." (Syl. ¶ 2.)

See, also, *Long v. Marshall*, 132 Kan. 643, 296 Pac. 346; *Woodley v. Howse*, 133 Kan. 639, 3 P. 2d 475; *New York Life Ins. & Trust Co. v. Hoyt*, 161 N. Y. 11.

Elizabeth, as we have seen, had legally adopted Helen Gladys Canfield Smith, and Mary, the last surviving of the three sisters, made a will, with a residuary clause, making Helen Gladys Canfield Smith, the adopted daughter of Elizabeth, her residuary legatee. She is the one to whom the district court awarded the property in Parsons. The court held that the entire beneficial interest passed to Mary, and that she had the ultimate title and had given it to the adopted child, Helen Gladys Canfield Smith. In this there was error. As only income of the property was given to the legatees, and the title went to the trustee and was left undisposed of by the will, it went into the residue class provided in section 17 of the will. It appears that most of the important facts as to property, the trusts given, the legacies named, and their use, including the values, are agreed upon, and it is the view of the court that upon the measure provided by section 17 the proportion to be received by each relative may, upon testimony as to value, be determined with reasonable certainty, but no part of it can be given to the adopted child.

The view of this court is that an estate tail was not created; that the gift of the property was to a trustee and not to the three Canfield sisters, that only the net income of the same was devised to them, that the title to the property was not disposed of in the gifts made and must be disposed of under the residuary clause of the will, which provides a specific measure for valuing it upon which the proportions are to be based. It follows that the judgment must be reversed, and this is done with the direction that title to the undisposed lot 21, block 26, in Parsons, shall be disposed of in accordance with paragraph 17 of the will.

JOHNSTON, C. J. (dissenting): I am unable to concur in all the conclusions reached by the court. While a trustee was named in the will, it occurs to me that the entire beneficial interest was devised to the three Canfield girls named in section three, and that it was the manifest intention of the testator that the survivor of the three should take the entire fee interest in the property. It appears that eight trusts were created by the will, and in every one of them, except that of section three, the testator made a disposition of the remainder of the trust, which implied that he intended a complete disposition of the property which was given for the sole use and benefit of the legatees. Besides, the trust became a passive and dry

trust. The trustee had no function to perform except to maintain the property, pay taxes, make repairs and collect the rent, and the net balance thus derived was to be divided equally among the three beneficiaries. On September 15, 1892, about forty-two years ago, he resigned and abandoned the task, and while he named a successor, she never qualified. The will provides that the successor should be appointed by a last will. It is conceded that this was not done, and it is likewise conceded that the one he named did not qualify, and did not actually become a trustee. By this time the legatees had become familiar with the method of handling the property and themselves took charge of it. There was no trustee in charge after the resignation of F. R. Morton. The functions of the trustee had ceased, there was no trustee, and the beneficiaries were in charge of the property until the last survivor died. The trustee had exercised no functions, and there has been a complete cessation of his powers and duties since his resignation, and in view of the terms of the will, the trust became passive and dry. Thereafter there was no occasion to require a legal title in the trustee. It has been decided:

"Whatever may be the limitations imposed by an instrument which creates an active trust, and whatever estate the trustee takes in the beginning, the legal estate in the trustee is divested out of him, and passes into the *cestui que trust,* on the instant that the duties and powers of the trust, from any cause, cease to be active, or cease to require a legal title in the trustee." (26 R. C. L. 1210.)

The following cases bear upon that question: *Doe v. Considine,* 6 Wall. 458; *French v. Edwards,* 21 Wall. 147; *Lincoln v. French,* 105 U. S. 614; *Robinson v. Pierce,* 118 Ala. 273; *Graham v. Whitridge,* 99 Md. 248; 39 Cyc. 224; Perry on Trusts, 7th ed., § 312; Hill on Trustees, 4th Am. ed., p. 360; 27 Am. & Eng. Enc. of L., 1st ed., 113, 124.

Before Mary died the title under the authorities vested in her. She was at liberty to convey or will the property to the adopted child of Elizabeth, or to anyone else, and the fee was thus passed to the adopted child. There was no issue of any of the three nieces, and that provision of the will was without effect.

I am of opinion that the judgment of the trial court was correct and should be affirmed.

HUTCHISON and SMITH, JJ., concur in this dissent.

Burch, J. (concurring): Paragraph 3 of the will gave the beneficiaries' income. In paragraph 18 income was defined as net income, after payment of taxes, repairs, insurance and unspecified necessary expenditures. Income was treated as synonymous with rent, so the property was to be rented, taxes were to be paid, repairs were to be made, insurance was to be kept up, and necessary incidental expenses were to be paid. The remainder of the gross income constituted net income to be paid to the beneficiaries.

The production of gross income by renting the property, the payment of taxes, the making of repairs, the keeping up of insurance, the looking after incidental matters, and the payment of net income to the beneficiaries, constituted duties of the trustee. They were active duties of exigent type, requiring incessant fulfillment.

The beneficiaries were to receive net income during their lives, and the survivor was to receive net income during her life. The duties of the trustee were to continue until death of the survivor. If the will of the testator was something to be respected, the trustee could not end management necessary to production of net income by resigning. His successor could not end management necessary to production of net income by failing to qualify and act.

Because the will required management until death of the surviving beneficiary, it was not possible for the trust to become dry before that time. The trustee, nor the substitute trustee, nor the beneficiary, nor all of them, had power to defeat the will and increase a gift to a beneficiary of net income only, from property, for life only, to fee-simple estate in the property, to accrue while the beneficiary was still alive.